Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Aug 20 2013, 5:43 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**STEPHEN T. OWENS**
Public Defender of Indiana

**LINDA K. HUGHES**
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**J.T. WHITEHEAD**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

JOYCE ANN HAWKINS, )
 )
 Appellant-Petitioner, )
 )
 vs. )  No. 27A02-1301-PC-47
 )
STATE OF INDIANA, )
 )
 Appellee-Respondent. )

APPEAL FROM THE GRANT SUPERIOR COURT
The Honorable Jeffrey D. Todd, Judge
Cause Nos. 27D01-0907-PC-140
27D01-0503-MR-55

**August 20, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**ROBB, Chief Judge**

## Case Summary and Issue

Joyce Ann Hawkins appeals the post-conviction court's denial of her petition for post-conviction relief. Hawkins raises one issue on appeal: whether the post-conviction court erred in concluding that witness testimony did not meet the requirements for newly-discovered evidence. Concluding that the post-conviction court did not err and the testimony failed to meet at least some of the requirements for newly-discovered evidence, we affirm.

## Facts and Procedural History

In February 2007, following a jury trial, Joyce was convicted of the murder of her ex-husband, Tim Hawkins. In March 2007, Joyce was sentenced to sixty years. She filed a direct appeal, and we affirmed her conviction in April 2008. Hawkins v. State, 884 N.E.2d 939 (Ind. Ct. App. 2008), trans. denied. In our opinion, we provided the following background:

> Joyce and Tim had been married, and after getting a divorce, Tim still lived with Joyce at her home in Gas City. Theirs was a tempestuous relationship that involved a number of calls to the police, specifically, in reference to this case, on February 15, 20, and 21, 2004. During the months preceding Tim's disappearance in March, Joyce told Tim's mother and a friend that she was going to kill him. At all relevant times, Joyce owned a nine-millimeter handgun.
> Beginning in April 2003, Tim and Joyce began work as truck drivers with a trucking company. They were both aware of the presence of a GPS tracking system in the truck. Initially they worked full time but then cut back to part time because of personal issues. In February 2004, Tim picked up a truck from the company's headquarters.
> Joyce and Tim planned to build a house on property they referred to as "the farm." On March 6, 2004, Tim submitted a change of address to the post office, moving from Joyce's house to his mother's house. An address change was also filed on March 13, 2004, switching the mail from Joyce's house to Tim's sister's address.
> On March 7, 2004, Joyce drank at a bar to the point of intoxication. Her father took her home, and during this trip she apparently fell down,

2

becoming "scraped up" as a result. On March 8, 2004, Joyce did not remember the fall and believed that Tim had beaten her up. Joyce looked for Tim and found him at a friend's house. Tim ignored her.

According to the GPS tracking system, on March 8, 2004, Tim's truck was located in Kokomo at 1:50 p.m. where it remained until 2:10 a.m. the next day. On March 8, 2004, Joyce walked to her aunt's home in Kokomo sometime before 2:33 p.m. and requested a ride to "the farm." On March 9, 2004, the trucking company received a message from Tim's truck stating, "Mike I [sic] sorry but I quit your truck is Indiana at I69 at Exit 19 by Subway Tim."

On March 10, 2004, a sheriff's deputy responded to a report of an abandoned vehicle in Pendleton, which he discovered was Tim's truck. Upon inspection, the sheriff's deputy noted a broken window, unlocked door, clean interior, and lack of blood. Shortly thereafter, a trucking company employee transported the truck to a company facility in Columbus, Ohio. The company began to repair the truck and prepare it for sale. They replaced the driver's side window, replaced the driver's side seat, began to repair pry marks around the door, and cleaned up the broken glass inside the truck. Additionally, they found a nine-millimeter bullet casing inside the dashboard. At no point did they find any blood, but they did note the torn seat and mattress and the presence of diesel fuel inside the cab.

After the truck had been recovered, a crime scene technician, Sergeant John Kelly ("Sergeant Kelly"), of the Indiana State Police went to Ohio to process the truck. At that time, the trucking company had already begun to repair the truck but had taken photos of the truck when it was recovered. Initially, Sergeant Kelly noted white marks indicating something being dragged across the floor of the cab and the presence of diesel fuel. Upon further investigation, Sergeant Kelly found that a mattress had two portions cut out of it. Also, Sergeant Kelly noted stains on the curtain behind the driver's seat. He collected the curtain and the stain for analysis. He also noted several small stains around the base of the driver's seat. Of five stains analyzed, only three came back as bloodstains, possibly from Tim. Two bloodstains were found around the base of the driver's seat and one on the curtain behind the driver's seat.

On March 29, 2004, Tim's family filed a missing person report after being notified by the trucking company that he had quit and abandoned the truck. After a press release asking for information on Tim, the police received four reports from persons who believed that they had seen a person who looked like Tim since he had been reported missing. The police did not follow up on these reports.

On August 3, 2004, Joyce was arrested on an unrelated intimidation charge. In early September of 2004, while in prison, Joyce wrote to a police officer and offered to provide information regarding narcotics in

exchange for her release. During the conversation, the officer asked about Tim, but Joyce refused to speak of it.

On September 9, 2004, Joyce confessed her involvement in Tim's death. Specifically, Joyce claimed that she accidentally shot Tim inside the truck at the farm. She then attempted to conceal the incident. Joyce claimed that she left Tim in the cab and returned home. She claimed that she returned later after buying five bottles of hydrogen peroxide from the Dollar General store. She said that she pulled Tim's body from the cab and put his body in a wheelbarrow to move it to the back of the property. However, when the body fell out of the wheelbarrow, she decided to burn the body where it fell near a building on the property. She claimed that she burned the body over the course of three or four days. Joyce also claimed that she threw the gun used in the shooting into the river. She then claimed to have taken the truck to Exit 19 to finish cleaning out the cab.

Joyce took three police officers to the river and showed where she had thrown the gun. Then they went to the farm where she showed them where Tim's body had been burned. Thereafter, the investigators followed up on the details of Joyce's confession. Using the GPS equipment in the truck, they determined that the truck could not have been at the farm when she said she was there. Also, Dollar General's sales records did not show any purchase of hydrogen peroxide for the time period claimed. The gun was never recovered despite two searches of the river. No evidence of a burned body was ever found at the farm.

After Joyce gave her confession to police on September 9, 2005, she wrote six letters while incarcerated, all of which were intercepted by the jail and forwarded to the prosecutor. The letters were written on September 10 or 11 and September 15, 2005. Three of the letters were written to "Dear Abby," Rev. Billy Graham, and a former minister, Marvin Wiseman, respectively. One letter was addressed to the officer investigating her case. The other two were addressed to her family. On September 15, 2005, the prosecutor obtained a search warrant to open the letters and did so.

Joyce wrote letters to "Dear Abby," Rev. Billy Graham, and Marvin Wiseman on September 11, 2004. In Joyce's letter to "Dear Abby," in September she requested help. She noted that "I know what I did, I will never get out." State's Ex. 70.4. Also she wrote, "I know I did not think of the boy's [sic] then, but, someone else had control of my min[d]." *Id.* In Joyce's letter to Billy Graham, she related how she was scared, didn't know what to do, and wanted help. Her letter to Marvin Wiseman requested that he help her and her family.

In a letter to her family written on September 12, 2004, she recounted the events of the night before the disappearance of Tim and how she met Tim that morning. She also wrote that she wanted to write more but couldn't, "[I]f you know what I mean." State's Ex. 70.6. In a card to her family written on September 10, 2004, she wrote a letter to her sons which stated, "[w]ith my luck, I know the court's [sic] won't find it a self-

de[f]ence. Because of what I did after word's [sic]." State's Ex. 70.2. She also wrote "sorry" on the envelope. Finally, in a letter to a friend written on September 10, 2004, she wrote that she didn't know how much she could write because "I know for sure they will read everything I write." State's Ex. 70.1. She also wrote about feeling like Tim is there helping her and that she was sexually abused as a child. She wrote that when she talked to somebody about something that had been bothering her for six months and got help for herself and Tim, she was put in jail. Also, she admitted that she could not remember the answers to questions that the police were asking her.

Id. at 941-43.

In June 2009, Joyce filed a pro se petition for post-conviction relief, which was amended by counsel in September 2012 to request relief on the grounds of material facts not previously heard. A hearing was held in November 2012, and in December 2012 the post-conviction court denied Joyce's petition. This appeal followed. Additional facts will be supplied as necessary.

## Discussion and Decision

### I. Standard of Review

To prevail on appeal from the denial of post-conviction relief, the petitioner must show that the evidence is without conflict and leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. Thacker v. State, 715 N.E.2d 1281, 1284 (Ind. Ct. App. 1999), trans. denied. A post-conviction court's findings and judgment will be reversed only upon a showing of clear error, which is error that leaves us with a definite and firm conviction that a mistake has been made. Benefield v. State, 945 N.E.2d 791, 797 (Ind. Ct. App. 2011). We accept the post-conviction court's findings of fact unless they are clearly erroneous, but we do not defer to the post-conviction court's conclusions of law. Id. We examine only the probative

5

evidence and reasonable inferences that support the post-conviction court's determination and we do not reweigh the evidence or judge the credibility of the witnesses. Conner v. State, 711 N.E.2d 1238, 1245 (Ind. 1999), cert. denied, 531 U.S. 829 (2000).

## II. Newly Discovered Evidence

In order for newly-discovered evidence to merit post-conviction relief, the petitioner must establish each of the following nine requirements:

> (1) the evidence has been discovered since the trial; (2) it is material and relevant; (3) it is not cumulative; (4) it is not merely impeaching; (5) it is not privileged or incompetent; (6) due diligence was used to discover it in time for trial; (7) the evidence is worthy of credit; (8) it can be produced upon a retrial of the case; and (9) it will probably produce a different result at retrial.

Bunch v. State, 964 N.E.2d 274, 283 (Ind. Ct. App. 2012), trans. denied. Joyce's petition hinged on allegations by Jessica Turner Angel that Angel had seen and briefly spoken to Tim in February 2010 while she was working as a manager at a McDonald's restaurant, when she served him food. The post-conviction court concluded that Joyce failed to satisfy at least three of the criteria for newly-discovered evidence. Specifically, the court concluded that Angel's alleged sighting of Tim was cumulative, that the evidence was not worthy of credit, and that the evidence would not produce a different result if Joyce were to be retried.[1]

The court concluded that the evidence was cumulative because at least six other witnesses testified at trial that they had seen Tim after his disappearance. "Cumulative evidence is 'additional evidence that supports a fact established by the existing evidence. . . . [T]o be considered cumulative, evidence should be of the same kind or character.

---

[1] The State also claims that Angel's testimony would have been discoverable in time for trial if due diligence had been used. However, the State misunderstands the timeline. Joyce was tried and sentenced in 2007, and Angel's alleged sighting of Tim did not occur until 2010.

That is, evidence will not be considered cumulative if it tends to prove the same facts, but in a materially different way.'" Id. at 290 (citation omitted). Here, Angel's testimony was of the same character as the other evidence related to sightings of Tim after his disappearance—witness testimony—and would not have proved that point in a materially different way. We disagree with Joyce's contention that Angel's testimony is materially different because she claims to have had a brief conversation with Tim, whereas the other witnesses only testified to seeing Tim.

The court also concluded that the evidence was not worthy of credit because of the "nature of Angel's prior conviction along with her inconsistent testimony at the evidentiary hearing, and the fact that Tim is never seen on the videotape of their alleged encounter at McDonalds." Appendix at 117. Angel was convicted in 2008 of trafficking with an inmate as a Class C felony after she attempted to smuggle contraband, including controlled substances, into the Indiana Department of Correction. As for the videotape, at the evidentiary hearing, a DVD was introduced which focused on the counter area of the McDonald's where Angel was working when she claimed to have seen Tim. Tim is not seen on the video, either ordering or picking up food. The inconsistency to which the court refers is likely the fact that Angel testified that she was so shaken after seeing Tim that she went to the backroom of the restaurant for ten to fifteen minutes; however, the DVD shows her working near the front of the store just thirty to forty-five seconds after she allegedly encountered Tim. It is not within our province to assess witness credibility or to replace the trial court's assessment of credibility with our own. Bunch, 964 N.E.2d at 292.

7

Finally, the post-conviction court concluded that the evidence would not produce a different result if Joyce were to be retried. We agree. Multiple witnesses testified at the original trial to having seen Tim after his disappearance, and one more witness testifying to the same thing, with video surveillance that does not support the testimony, would be unlikely to change the result. The State points out that there was also strong evidence against Joyce: her confession, the letters she wrote while incarcerated, evidence of motive and intent, and more. Altogether, we agree that addition of Angel's testimony would probably not lead to a different result on retrial. Regardless of whether Angel's testimony was credible or not, Joyce has failed to meet at least two other criteria required to merit post-conviction relief here.

## Conclusion

Concluding that Joyce has not met the requirements for newly-discovered evidence entitling her to a new trial, we affirm.

Affirmed.

RILEY, J., and KIRSCH, J., concur.