## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 13 2019, 7:43 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

John Andrew Goodridge
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Darryl Anderson, <br> *Appellant-Petitioner,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Respondent.* | December 13, 2019 <br><br> Court of Appeals Case No. <br> 49A02-1708-PC-1936 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Marc T. Rothenberg, Judge <br><br> The Honorable Amy J. Barbar, Magistrate <br><br> Trial Court Cause No. <br> 49G02-1411-PC-52287 |

**Mathias, Judge.**

After his convictions for rape, criminal confinement, and battery were affirmed on direct appeal, Darryl Anderson ("Anderson") filed a petition for post-conviction relief, which the Marion Superior Court denied. Anderson appeals and presents four issues, which we consolidate and restate as whether the post-conviction court clearly erred in determining that Anderson's trial counsel was not ineffective for: (1) failing to present a *Brady* claim regarding evidence of the victim's mental disability, (2) failing to object to the competency of the victim to testify based on her mental disability, and (3) failing to raise a double jeopardy claim at sentencing.

We affirm.

## Facts and Procedural History

The facts forming the basis of Anderson's convictions were set forth by this court in Anderson's direct appeal as follows:

> A.M., an adult with the mental and learning capacity of a sixth-grader, met Anderson in late 2009, when she lived in the city of Anderson. During the next four or five months, A.M. "hung out" with Anderson and occasionally had sex with him. In the spring of 2010, A.M. moved into her sister's Indianapolis home. Soon thereafter, A.M. ended her relationship with Anderson and began dating someone else.

> On the night of May 10, 2010, A.M. was visiting a friend on the east side of Indianapolis when she telephoned Anderson to ask for a ride to her sister's house on the west side. After picking up A.M., Anderson began asking her about her boyfriend and whether she had sex with him. When A.M. answered in the affirmative, Anderson struck A.M.'s head. He continued to hit

her, causing A.M. pain. Anderson told A.M. that she was "now in his territory" and that she was "his bitch[.]"

Instead of taking A.M. to her sister's house, Anderson stopped at an off-track betting ("OTB") venue to pick up a friend, Michael Williams, and take him to work. Although Anderson left A.M. alone in the vehicle while he went inside the OTB, A.M. did not leave because Anderson "had already been hitting [her]," and she believed he "would have chased [her] and try [sic] to hit [her] some more."

Anderson told Williams that "he had some stuff to do on the west side in the morning, he didn't feel like going back east" and asked if he could "just chill" at Williams's apartment until the morning while Williams was at work. Anderson offered to pick up Williams when his shift ended at 7:00 a.m. Williams agreed and gave Anderson the key to his apartment.

Anderson continued driving A.M. around after dropping off Williams at work. At one point, he stopped at a liquor store and bought some beer. A.M. again stayed in the car because she did not know where she was, and it was dark. From the liquor store, Anderson drove to an acquaintance's house. After arguing with A.M., Anderson told her to get out of the car, which she did. Anderson then threw a beer bottle at A.M. but missed.

After A.M. left the vehicle, Anderson telephoned A.M.'s sister, Marquirite Brooks, and told her that A.M. had "tripped when she got out of the car and started walking. . . ." By this time, A.M. had walked to a gas station and also telephoned Brooks. A.M., unaware that Anderson was on hold with Brooks, asked Brooks to pick her up and gave Brooks her location. Brooks "clicked over and told [Anderson], [A.M.] [was] at the Speedway, go get her." Brooks then told A.M., "okay, he's-he

[sic] about to come and get you." A.M. thought Brooks meant Brooks's boyfriend would be picking her up.

Before hanging up, Anderson told Brooks they would be at the house in forty-five minutes. Knowing it would not take so long to get to her house, Brooks tried calling Anderson back several times, but the telephone calls kept going to voice mail.

By the time Anderson arrived at the gas station, it was raining. Tired, wet, and believing that Anderson "had calmed down and everything was okay and he was just gonna [sic] take [her] to [her] sister's house," A.M. got in the car. Instead, Anderson drove to Williams's apartment complex.

Before he got out of the car, Anderson kept asking, "you thought I was gonna [sic] pick you up, but you didn't have to give me nothing?" Anderson then went to the passenger's side, grabbed A.M.'s arm, and pulled her out of the car. Anderson then threw A.M.'s bag into a dumpster. As A.M. tried to retrieve her bag, Anderson started "tussling" with her before pulling A.M. by the hair and dragging her into the apartment building. When A.M. protested, Anderson threatened to punch her. He then unlocked the door to Williams's apartment and forced A.M. inside.

When A.M. tried to escape, Anderson pushed her down to the floor. He then "stomped on [her] back" and pinned her neck down with his knee. A.M. struggled with Anderson, who pushed A.M. onto a sofa. Anderson then "unzipped his pants and he started wiggling his-self [sic] in [A.M.'s] face." Anderson next made A.M. undress and take a shower.

When A.M. finished showering, she returned to the living room, where Anderson had put her clothes. As she started getting dressed, Anderson grabbed A.M. by the pants and pushed her down on the sofa. A.M. pleaded to Anderson to stop and let her

go to her sister's house, but Anderson kept telling her that she was "[a]bout to give [him] some." Anderson then hit A.M. and pinned her down. Despite A.M.'s protests, Anderson "put his private part inside [her] vagina."

After Anderson ejaculated, he "got off of A.M. and let her get dressed. Anderson then drove A.M. to her sister's house. Before A.M. got out of the vehicle, Anderson threatened that he would "find" A.M. if she called the police.

After dropping off A.M., Anderson returned to Williams's work at approximately 4:00 a.m. Anderson gave Williams his key back and "said he'd just take care of his business later on in the day." Williams did not see Anderson again that day.

Later that morning, after Brooks noticed several bruises on A.M., A.M. informed her that Anderson had "beat [her] up." She did not tell her sister that Anderson had raped her because she did not want to upset her sister. A.M.'s sister telephoned the police, who had A.M. transported to a hospital. A.M. told hospital personnel that Anderson had raped her.

A physical examination conducted by a forensic nurse examiner revealed several bruises to A.M.'s head and body in addition to burst blood vessels in her eye, an injury commonly caused by pressure to the neck. A.M. also suffered a laceration to her vagina, which was "consistent with a sexual assault [.]"

Using a Sexual Assault Evidence Collection Kit, the forensic nurse swabbed A.M.'s vagina for evidence. She also collected A.M.'s underwear. Anderson subsequently stipulated that tests revealed seminal material on the vaginal swab and A.M.'s underwear and that, to a reasonable degree of scientific certainty, he was the source of DNA extracted from both samples.

Detective Dale Horstman, a criminal investigator with the Speedway Police Department, interviewed A.M. Detective Horstman observed several injuries, including bruises to A.M.'s head and body and burst blood vessels in A.M.'s eye. Although A.M. did not know the address, Detective Horstman was able to locate Williams's apartment based on a description given by A.M. With Williams's cooperation, Detective Horstman confirmed that the lay-out of the apartment was as A.M. had described it.

*Anderson v. State*, No. 49A02-1107-CR-601, 2012 WL 1894270 at *1–3 (Ind. Ct. App. May 24, 2012), *trans. denied* (record citations omitted).

[4] The State charged Anderson with: Count I, Class B felony rape; Count II, Class C felony criminal confinement; Count III, Class C felony criminal confinement; Count IV, Class A misdemeanor battery; Count V, Class A misdemeanor battery, and Count VI, Class A misdemeanor battery. At the conclusion of a two-day jury trial, the jury found Anderson guilty as charged. At sentencing, the trial court merged Count III into Count I, and merged Counts V and VI into Count IV. The trial court imposed an aggregate sentence of fifteen years.

[5] On direct appeal, Anderson claimed that the prosecutor had committed misconduct. We rejected this claim and affirmed Anderson's convictions. *Id.* at *5.

[6] Anderson filed a pro se petition for post-conviction relief on November 26, 2012. On November 24, 2014, Anderson filed an amended petition for post-conviction relief. This amended petition was itself amended on February 23 and August 28, 2015. The trial court heard evidence on Anderson's petition on

March 15–16, May 10, June 28, and September 20, 2016. The trial court issued findings of fact and conclusions of law denying Anderson's petition on July 27, 2017. Anderson now appeals.[1]

## Post-Conviction Standard of Review

Post-conviction proceedings afford petitioners a limited opportunity to raise issues that were unavailable or unknown at trial and on direct appeal. *Davidson v. State*, 763 N.E.2d 441, 443 (Ind. 2002). The post-conviction petitioner bears the burden of establishing grounds for relief by a preponderance of the evidence. *Henley v. State*, 881 N.E.2d 639, 643 (Ind. 2008). Thus, on appeal from the denial of a petition for post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. *Id.* To prevail on appeal from the denial of post-conviction relief, the petitioner must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. *Id.* at 643–44.

Because the post-conviction court made specific findings of fact and conclusions of law in accordance with Indiana Post-Conviction Rule 1(6), we must

---

[1] Anderson filed his Notice of Appeal on August 23, 2017. The trial court clerk filed a Notice of Completion of Clerk's Record on September 27, 2017, and a Notice of Completion of Transcripts on October 11, 2017. After numerous delays, this court issued an order on June 22, 2018, ordering Anderson to file his Brief of Appellant within thirty days or face dismissal of the appeal. Anderson submitted a defective Brief of Appellant on July 23, 2018, and the Clerk of this court issued a notice of defect. Anderson submitted an amended Brief on August 20, 2018, which our Clerk marked as untimely filed. We then issued an order on August 24, 2018, ordering our Clerk to mark this Brief as filed and ordering the State to file a Brief of Appellee within thirty days of our order. On October 23, 2018, we granted the State's motion to compel Anderson to file a conforming Appendix and ordered that the State's Brief be due within thirty days of the filing of the conforming Appendix. We issued similar orders on January 4, March 7, and March 28, 2019. Anderson finally filed a conforming Appendix on March 28, 2019. After receiving an extension of time, the State filed its Brief on May 30, 2019.

determine on review whether the post-conviction court's findings are sufficient to support its judgment. *Graham v. State*, 941 N.E.2d 1091, 1096 (Ind. Ct. App. 2011), *aff'd on reh'g*, 947 N.E.2d 962. Although we do not defer to the post-conviction court's legal conclusions, we review the post-conviction court's factual findings for clear error. *Id.* Accordingly, we will not reweigh the evidence or judge the credibility of witnesses, and we will consider only the probative evidence and reasonable inferences flowing therefrom that support the post-conviction court's decision. *Id.*

## Effective Assistance of Trial Counsel

[9] Anderson contends that his trial counsel was ineffective in various ways. Our supreme court has summarized the law regarding claims of ineffective assistance of trial counsel as follows:

> A defendant claiming a violation of the right to effective assistance of counsel must establish the two components set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the defendant must show that counsel's performance was deficient. This requires a showing that counsel's representation fell below an objective standard of reasonableness, and that the errors were so serious that they resulted in a denial of the right to counsel guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Counsel is afforded considerable discretion in choosing strategy and tactics, and we will accord those decisions deference. A strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. The *Strickland* Court recognized that even the finest, most experienced criminal defense attorneys may not agree on the ideal strategy or the most effective way to represent a client. Isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective. The two prongs of the Strickland test are separate and independent inquiries. Thus, if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.

*Timberlake v. State*, 753 N.E.2d 591, 603 (Ind. 2001) (citations and quotations omitted).

### I.  Failure to Present **Brady** *Claim*

Anderson first claims that his trial counsel was ineffective for failing to present a *Brady* claim. In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." To prevail on a *Brady* claim, "a defendant must establish: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial." *Minnick v. State*, 698 N.E.2d 745, 755 (Ind. 1998). Under *Brady*, evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bunch v. State*,

964 N.E.2d 274, 297 (Ind. Ct. App. 2012) (internal quotation marks and citations omitted), *trans. denied*. Importantly, however, the State will not be found to have suppressed material evidence if the evidence was available to a defendant through the exercise of reasonable diligence. *Id.* (citing *Conner v. State*, 711 N.E.2d 1238, 1246 (Ind. 1999)).

[11] Anderson claims that the State suppressed evidence that A.M., the victim, was mildly mentally handicapped. A.M. testified at trial that she had been diagnosed as "mildly mentally handicapped," and had an IQ level of "sixth grade." Trial Tr. pp. 37–38. The only evidence Anderson presented at the post-conviction hearing on this issue was his examination of his trial counsel with regard to A.M.'s mental handicap, which consists of the following exchange:

> Q.   Did the State provide you with any *documentation* of [A.M.]'s mental condition prior, during, or after my trial?
>
> A.   No.
>
> Q.   Do you think that her testimony that she suffered a mental condition was sufficiently prejudicial to the crime and a fair trial?
>
> [State's objection overruled]
>
> A.   I do remember being surprised to hear that information during the trial. Whether that means you received an unfair trial, I don't think so.
>
> Q.   Why would you say that?
>
> A.   It's just my opinion, I guess.

Q. Do you think the State should have provided you with *documentation* of her alleged mental condition prior to my trial?

[State's objection overruled]

A. Do I think they should have? I certainly would have liked them to have. I don't believe they had a legal obligation to – well, I suppose they probably should have, any relevant information, exculpatory or inculpatory.

Q. Do you believe that the State's failure to provide you with *documentations* of [A.M.]'s alleged mental condition constituted a Brady violation?

A. I don't believe that's a Brady violation. I do not believe that's a Brady violation.

Q. You do not? Okay. . . .

Post-Conviction Tr. pp. 98–99 (emphases added).

[12] As noted by the State, Anderson asked his trial counsel whether he had received any *documentation* regarding A.M.'s mental capacity. Anderson presented no evidence, however, that the State was in possession of any such documentation. Nor is there any indication that the State otherwise hid A.M.'s mental disability from Anderson. Indeed, Anderson was able to depose A.M. prior to trial.[2] And the evidence in the Trial Appendix shows that the Marion County Prosecutor's Office maintained an "open file" policy whereby defense counsel could review

---

[2] A.M. testified at trial that she did not mention her mental disability during her deposition because she did not think it was important. Trial Tr. p. 80.

the prosecutor's file including "all appropriate discovery, excluding work product." Trial Appendix pp. 46, 50, 52, 54, 59, 61.

[13] Anderson has not shown how evidence of A.M.'s mental disability was unavailable to him through the exercise of reasonable diligence. *See Bunch*, 964 N.E.2d at 297 (citing *Conner*, 711 N.E.2d at 1246). Indeed, Anderson was in a sexual relationship with A.M. for four or five months.

[14] Because Anderson presented no evidence that the State suppressed evidence of A.M.'s mental capabilities, and because information regarding A.M.'s mental capabilities was available to Anderson through the exercise of reasonable diligence, he has not established that there was any *Brady* violation. Therefore, Anderson has not shown that his trial counsel was ineffective for failing to present a *Brady* claim.

## II. Failure to Challenge Victim's Competency

[15] In a related argument, Anderson contends that his trial counsel was ineffective for failing to challenge A.M.'s competency to testify by seeking a continuance, requesting a competency hearing, objecting to A.M.'s testimony, and moving for a mistrial. Of course, Anderson's trial counsel was not required to do any of these things if A.M. was competent to testify. And Anderson did not establish that A.M. was incompetent to testify.

[16] Anderson argues that if his trial counsel had objected to A.M.'s competency to testify, the trial court would have been required under Indiana Evidence Rule 601 to hold a competency hearing to satisfy the court that she was, in fact,

competent to testify.[3] Anderson contends that, under Evidence Rule 601, a witness is not presumed to be either competent or incompetent. He is incorrect.

[17] Evidence Rule 601 provides that "[e]very person is competent to be a witness except as otherwise provided in these rules or by statute." We have held that this rule "presumes that every person is a competent witness unless otherwise provided by statute or rule." *Saylor v. State*, 55 N.E.3d 354, 361 (Ind. Ct. App. 2016), *trans. denied*; *see also Ackerman v. State*, 51 N.E.3d 171, 191 (Ind. 2016) (noting that current evidentiary rule "presumes that every person is a competent witness unless otherwise provided by statute or rule[.]"). Thus, contrary to Anderson's claim, A.M. was presumed to be a competent witness, and he has not referred us to any rule or statute providing that she was incompetent.

[18] More fundamentally, Anderson has not shown that A.M. was, in fact, incompetent to testify as a witness. A.M. was an adult whose testimony was lucid and coherent, regardless of any inconsistencies. Indeed, other than referring to A.M.'s testimony regarding her mental abilities, Anderson cites to no evidence supporting his claim that her IQ level made her incompetent to testify. We decline to hold that simply because A.M. had the IQ of a sixth grader, she was incompetent to testify. Accordingly, even if his trial counsel had

---

[3] In support of his argument that the trial court would have been required to hold a competency hearing had his trial counsel challenged A.M.'s competency, Anderson cites *Newsome v. State*, 686 N.E.2d 868, 872 (Ind. Ct. App. 1997). The *Newsome* court held that Evidence Rule 601 "d[id] not affect previous Indiana decisions regarding the competence of *children* to testify." As *Newsome* involved the competency of a child, we do not find it instructive. The same is true of Anderson's citation to *Hughes v. State*, 546 N.E.2d 1203, 1209 (Ind. 1989), which not only predates the adoption of the Indiana Rules of Evidence, but also dealt with a minor witness.

challenged A.M.'s competence to testify, Anderson has not shown that he would have been successful in excluding her testimony.

[19] We also note that Anderson's trial counsel, although he was unaware before trial of A.M.'s claims regarding her mental capabilities, used A.M.'s testimony to further attack her credibility, noting that she had not mentioned her capacity to the investigating detective or to defense counsel during deposition. *See* Trial Tr. pp. 79–80. We therefore conclude that the post-conviction court did not clearly err by rejecting Anderson's claim that his trial counsel was ineffective for failing to challenge A.M.'s competency to testify.

### III. Failure to Raise Double Jeopardy Claim at Sentencing

[20] Lastly, Anderson contends that the post-conviction court erred by rejecting his claim that his trial counsel should have raised a double jeopardy argument at sentencing. Anderson claims that double jeopardy prevented the trial court from imposing convictions on Counts III, V, and VI. Anderson contends that Counts III, V, and VI should have been vacated, not merely "merged," and that his trial counsel was ineffective for failing to argue this to the trial court at sentencing.

[21] "[A] defendant's constitutional rights are violated when a court *enters judgment* twice for the same offense, but not when a defendant is simply found guilty of a particular count." *Green v. State*, 856 N.E.2d 703, 704 (Ind. 2006) (emphasis added). As we summarized in *Kovats v. State*:

> If a trial court does not formally enter a judgment of conviction on a jury verdict of guilty, then there is no requirement that the trial court vacate the "conviction," and merger is appropriate. *Townsend v. State*, 860 N.E.2d 1268, 1270 (Ind. Ct. App. 2007) (quoting *Green v. State*, 856 N.E.2d 703, 704 (Ind. 2006))[, *trans. denied*]. However, if the trial court does enter judgment of conviction on a jury's guilty verdict, then simply merging the offenses is insufficient and vacation of the offense is required. *See id.; Green*, 856 N.E.2d at 704; *Gregory v. State*, 885 N.E.2d 697, 703 (Ind. Ct. App. 2008) (where trial court entered judgments of conviction on jury's verdicts of guilty for dealing and conspiracy, then later merged the convictions for double jeopardy reasons, such merging without also vacating the conspiracy conviction was insufficient to cure the double jeopardy violation)[, *trans. denied*].

982 N.E.2d 409, 414–15 (Ind. Ct. App. 2013).

[22] Here, there is no indication that the trial court ever entered judgments of conviction on Counts III, V, and VI. To the contrary, the trial court stated at sentencing:

> The Court would enter judgment of conviction against the defendant as to Count I, Rape as a Class B felony, and also as to Count II, Confinement as a Class C felony. The Court will be merging Count III into the rape charge and not entering judgment of conviction, and would enter judgment of conviction against the defendant for Count IV, Battery, finding that V and VI would merge into Count IV.

Trial Tr. pp. 274–75. The abstract of judgment also indicates that the trial court entered judgment of conviction only on Counts I, II, and IV. Trial App. p. 21. Because the trial court never entered judgments of conviction on Counts III, V,

and VI, there was no double jeopardy problem with regard to these counts. Thus, the trial court's "merger" was sufficient to cure any double jeopardy issue. *See Kovats*, 982 N.E.2d at 415. Anderson's trial counsel was therefore not ineffective for failing to argue that the trial court should vacate these counts for which no judgment of conviction was ever entered.

## Conclusion

[23] The post-conviction court did not clearly err in rejecting Anderson's claims of ineffective assistance of trial counsel. The victim's low IQ was discoverable by Anderson through the exercise of reasonable diligence, and there is no evidence that the State withheld evidence of A.M.'s mental capacity. Thus, there was no *Brady* violation, and Anderson's trial counsel was not ineffective for failing to make a *Brady* claim. A.M., like all witnesses, was presumed competent to testify, and Anderson presented no evidence that she was incompetent to testify. His trial counsel was therefore not ineffective for failing to object to A.M.'s competency to testify or move for a mistrial based on her alleged incompetency. Lastly, the trial court did not enter judgments of conviction on Counts III, V, and VI. Accordingly, there was no double jeopardy issue with regard to these counts, and Anderson's trial counsel was not ineffective for failing to argue that the trial court's "merger" was insufficient. We therefore affirm the judgment of the post-conviction court.

[24] Affirmed.

May, J., and Brown, J., concur.